UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| RIVER ROAD HOTEL PARTNERS, ) | No. 09 B 30029 |
| LLC, ) | |
| ) | |
| Debtor. ) | Judge Janet S. Baer |

**MEMORANDUM OPINION**

This is a dispute over an approximately $2.6 million restructuring fee. River Road Hotel Partners, LLC and its affiliates (the "Debtors") retained FBR Capital Markets & Co. ("FBR") as a financial advisor pursuant to both an engagement letter dated August 13, 2009 (the "Engagement Letter") and the Court's retention order dated September 17, 2009 (the "Retention Order"). In the Engagement Letter, the Debtors agreed to pay a restructuring fee based on the percentage of indebtedness involved in any restructuring (the "Restructuring Fee"). The Retention Order made payment of the Restructuring Fee contingent upon the consummation of a restructuring contemplated by the Engagement Letter.

The Debtors filed a plan that sought to sell encumbered assets free and clear of liens without allowing the secured lender, Amalgamated Bank, to credit bid its claim in the sale. The Debtors' plan was unsuccessful, and ultimately the Court confirmed a plan proposed by Amalgamated Bank. The confirmed plan created Bletchley Hotel at O'Hare LLC ("Plan Transferee" or "Bletchley"). Pursuant to the plan, Bletchley is responsible for the payment of all allowed administrative expenses in this case.

After FBR filed its final fee application, which included a request for the Restructuring Fee, Bletchley objected, thus giving rise to the present dispute. At issue is whether the

1

restructuring that took place in this case, which was pursuant to a plan submitted not by the Debtors but by Amalgamated Bank, was a restructuring for which FBR is entitled to the Restructuring Fee.

The matter is on remand from the district court, *FBR Capital Mkts. & Co. v. Bletchley Hotel at O'Hare LLC*, No. 13 C 746, 2013 WL 5408848, at *3 (N.D. Ill. Sept. 24, 2013) (the "District Court Decision"), which affirmed the bankruptcy court's denial of summary judgment for FBR and reversed the *sua sponte* grant of summary judgment for Bletchley. In accordance with the district court's mandate, this Court held a three-day bench trial to determine whether FBR is entitled to the Restructuring Fee. For the reasons set forth below, the Court finds that FBR is entitled to the Restructuring Fee.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

## BACKGROUND

The Court incorporates the background section of the District Court Decision. To provide context for this ruling, certain relevant facts are repeated below, together with additional facts pertinent to this Memorandum Opinion.

This case arises out of the Debtors' chapter 11 filing in connection with their ownership of the Intercontinental Hotel at O'Hare Airport. The Debtors retained FBR, and FBR performed contracted-for financial services. It is undisputed that for its work, FBR was entitled to a monthly fee and expense reimbursement. However, when FBR applied for the Restructuring Fee, Bletchley claimed that FBR was not eligible to receive that fee because the restructuring in

this case was based on a third party's plan. Bletchley argued that the agreement regarding the Restructuring Fee was unclear and that parol evidence explained that FBR was not entitled to the Restructuring Fee because the plan confirmed was neither the Debtors' plan nor the result of FBR's efforts.

FBR filed a motion for summary judgment and also moved *in limine* to preclude Bletchley's parol evidence. Counsel for the Debtors, David Neff ("Neff"), filed a declaration in connection with FBR's motion for summary judgment in which he indicated his understanding was that "FBR was entitled to the restructuring fee under the Engagement Letter only if the restructuring occurred through a Debtor-sponsored plan." Bankruptcy Judge Bruce W. Black found the Retention Order ambiguous and relied on the Neff declaration to grant summary judgment *sua sponte* for Bletchley. Judge Black then denied FBR's motion *in limine* to preclude parol evidence as moot. The district court affirmed in part, reversed in part, and remanded the matter for trial. The district court found that the agreement regarding the Restructuring Fee, which consisted of both the Engagement Letter and the Retention Order, was ambiguous and that the agreement's interpretation presented a genuine issue of material fact. In light of the remand, the motion *in limine* is no longer moot. After briefing and oral argument, the Court took the motion *in limine* under advisement and heard the parties' evidence at trial.

On remand, this Court has been tasked with making findings in response to the following question of fact: Is FBR entitled to a Restructuring Fee even though the plan confirmed was a plan sponsored by a third party?

## FINDINGS OF FACTS

The story begins in August 2009, with the negotiating and drafting of the Engagement Letter. Brian Taylor ("Taylor"), a managing director at FBR, drafted the Engagement Letter at

3

the direction of Kevin Phillips ("Phillips"), the senior managing director and head of the financial restructuring group at FBR. (Trial Tr. vol. 1, 30:22–24, 35:2–8, 35:20–23, Mar. 24, 2014; Phillips Dep. 8:20–25, Oct. 2, 2012; FBR's Ex. B.)

The compensation structure outlined in the Engagement Letter evolved from the form in which it was initially proposed into its final form. In addition to a retainer, each draft of the Engagement Letter contained three different kinds of fees: a monthly fee, a restructuring fee, and a financing fee. The first draft provided for a $165,000 retainer, a monthly fee of $165,000, and a restructuring fee equal to 90 basis points of the aggregate principal amount of any existing obligations involved in the restructuring. (Trial Tr. vol. 1, 36:15–24; FBR's Ex. C.) In the second draft, the retainer and monthly fee were each lowered to $150,000; the restructuring fee remained the same. (Trial Tr. vol. 1, 41:17–18; 43:2–13; FBR's Ex. D.) The third draft further reduced the retainer and monthly fee in exchange for a higher restructuring fee. (Trial Tr. vol. 1, 44:2–9; FBR's Ex. E.) The retainer and monthly fee were each lowered from $150,000 to $20,000. The restructuring fee increased from 90 basis points to 125 basis points. (Trial Tr. vol. 1, 47:15–48:1.) In the final draft of the Engagement Letter, the monthly fee was decreased to $10,000 and the Restructuring Fee was increased to 135 basis points. (FBR's Ex. A.) The retainer was increased to $50,000 with the proviso that FBR would apply that retainer to the first five monthly fee payments. (Trial Tr. vol. 1, 62:10–16.) There was no relevant change to the financing fee among the drafts.

FBR's representatives testified that FBR would not have agreed to the $10,000 monthly fee if the Restructuring Fee had not been increased to 135 basis points. (Trial Tr. vol. 1, 64:10–19; FBR's Ex. A.) Taylor testified that because FBR was cutting the monthly fee, it considered what the total compensation might be over the course of the engagement. (Trial Tr. vol. 1,

4

64:25–65:3.) To help the Debtors' cash flow, FBR was willing to reduce the monthly fee but was not willing to give up "all that cash consideration." (Trial Tr. vol. 1, 65:3–6.) What FBR was giving up in monthly fees was simply moved over to the Restructuring Fee. (Trial Tr. vol. 1, 65:6–8; Goldberg Dep.[1] 39:12-40:20; Plan Transferee's Ex. 3.)

To assure acceptable compensation once the monthly fee was reduced, Taylor expanded the definition of "restructuring" in the third draft of the Engagement Letter. He made the definition "extremely broad by the use of the word 'any,'" the purpose of which was to trigger the Restructuring Fee under a wide range of circumstances. (Trial Tr. vol. 1, 56:13–57:4.) In the final draft of the Engagement Letter, "restructuring" is defined, in relevant part, as follows:

> As used in this Agreement, the term "Restructuring" shall mean, collectively, *any* restructuring, reorganization and/or recapitalization . . . that involves all or a significant portion of the Company's outstanding [obligations] that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations . . . .

(FBR's Ex. A (emphasis added).)

In drafting the Engagement Letter, Taylor did not contemplate any restriction as to the source of the restructuring. (Trial Tr. vol. 1, 58:6–9.) Taylor testified that FBR would not have agreed to take on the engagement if the Restructuring Fee had been contingent upon the identity of the party that ultimately achieved a successful restructuring of the Debtors' estate. (Trial Tr. vol. 1, 66:9–15.) Although FBR acknowledged some limitations on recovering the Restructuring Fee, such as a chapter 7 liquidation, foreclosure, or an assignment for the benefit of creditors, FBR expected to get the Restructuring Fee for "any form of restructuring, regardless of how it came to fruition." (Trial Tr. vol. 1, 67:7-21; Goldberg Dep. 42:3-9).

---

[1] "Goldberg" refers to Steven Goldberg, the head of the real estate investment banking group at FBR at the time. Goldberg did not provide live testimony at trial. Instead, his testimony was introduced through deposition designations.

5

According to Taylor, the overall compensation amounts and the structure of the compensation in the Engagement Letter were consistent with market rates when the Engagement Letter was initially prepared. (Trial Tr. vol. 1, 41:2–6.) However, the ultimate retainer and monthly fee were below market rates for this type of engagement. (Trial Tr. vol. 1, 48:6–25.)

On September 3, 2009, the Debtors filed an application to employ FBR. Attached to the application were the Engagement Letter and a proposed retention order. Paragraph four of the proposed retention order stated the following regarding the payment of fees to FBR:

> 4. Notwithstanding anything contained herein to the contrary, the fees payable to FBR pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standards of review set forth in section 330 of the Bankruptcy Code.

(Plan Transferee's Ex. 29.) The original proposed retention order did not include any specific language regarding payment of the Restructuring Fee.

The Engagement Letter provided that FBR would be entitled to the Restructuring Fee under a wide range of circumstances. Counsel for the unsecured creditors' committee, Steven Bobo ("Bobo"), questioned this broad entitlement. (Trial Tr. vol. 1, 83:7–9; Phillips Dep. 51:4–8.) In an email message dated September 9, 2009 (the "September 9 email"), Bobo wrote to the Debtors' counsel Neff: "I also think that the Restructuring Fee ought to be expressly described in the order as a contingent fee based on the results of [FBR's] efforts, like a success fee. I believe that this is likely what the parties had in mind, and there is no reason why administrative creditors ought to share with FBR if [its] restructuring efforts are not successful." (Trial Tr. vol. 1, 136:18–24; Phillips Dep. 48:9–51:8; Goldberg Dep. 58:18–59:4; FBR's Ex. K.)

At trial, both parties introduced parol evidence, mostly in the form of email exchanges, regarding what occurred after Bobo's inquiry. The parol evidence was confusing and did not

6

clarify anything regarding the terms under which FBR would be entitled to the Restructuring Fee. After Bobo's inquiry, Neff made changes to the original proposed retention order that was attached to the application to employ FBR. Neff testified that he modified the original proposed retention order to address issues raised by Bobo and the United States Trustee. (Trial Tr. vol. 2, 310:7–11, Mar. 25, 2014.) In particular, Neff added subsections (a) and (b) to paragraph four of the Retention Order. Paragraph 4(a) reads as follows:

> 4. Notwithstanding anything contained herein to the contrary, the fees payable to FBR pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standards of review set forth in section 330 of the Bankruptcy Code; provided however, that (a) the "restructuring" fee described in paragraph 13(c) of the Application is expressly contingent upon the consummation of a restructuring contemplated by the Engagement Letter . . . .

(Plan Transferee's Exs. 14, 29 (emphasis in original).)

The parties also introduced parol evidence regarding how the language in paragraph 4(a) of the Retention Order was created. Once again, the parol evidence was confusing and unhelpful. It is unclear how Neff came up with the language for paragraph 4(a). (Trial Tr. vol. 2, 346:13–21.) Neff did not add specific language to the Retention Order to make payment of the Restructuring Fee contingent on FBR's success, as suggested by Bobo, or contingent on confirmation of a "debtor-sponsored plan," as later discussed in Neff's affidavit. At trial, when asked why not, Neff stated as follows:

> Because we have a bit of a disconnect here. FBR was retained by the debtor, by Peter Dumon. Our interest as counsel for the debtor at the outset of the case was to confirm a plan for the debtor. We were not interested in a lender plan . . . we were not interested in Steve Bobo's plan for the creditors. So what we contemplated, what I contemplated, at that time was FBR's efforts on behalf of the debtor. So the only thing in my world of thinking was a debtor plan.

7

(Trial Tr. vol. 2, 344:24–345:13.)

There was no evidence submitted to suggest that the parties ever agreed the Restructuring Fee was contingent on confirmation of a debtor-sponsored plan. The phrase "debtor-sponsored plan" was never used during negotiations with FBR. The revised Retention Order did not contain that phrase. Nor did the revised Retention Order state that the Restructuring Fee was to be "based on the results of [FBR's] efforts." (Goldberg Dep. 122:14–23; Trial Tr. vol. 2, 273:2–23.) When Goldberg was asked whether he knew if the language added to paragraph 4(a) was added in response to the concerns raised by Bobo's September 9 email, Goldberg answered: "Given that [paragraph (a)] does not provide for language that would satisfy Mr. Bobo, I'll have to say, no." (Goldberg Dep. 78:15–20.) Goldberg did not recall any conversations regarding the origin of the language in paragraph 4(a) or why it was added to the Retention Order. (Goldberg Dep. 79:11–22.)

The same revision to the Retention Order that added subsection (a) to paragraph four also added subsection (b). Paragraph 4(b) provides that FBR waives the "financing" fee, without prejudice to the Debtors' and FBR's right to supplement the application to request any such fees. While the parties agree that Paragraph 4(b) of the Retention Order resolved the United States Trustee's concerns regarding the financing fee, they disagree on the significance of this fact. (Trial Tr. vol. 1, 80:15–81:8; 88:7–20; 133:5–12.) The inference urged by Bletchley is that subsection (a) likewise resolved concerns raised by Bobo and the creditors' committee. FBR points to the clear language in subsection (b), however, and contrasts that with the more ambiguous language in subsection (a).

On September 17, 2009, a hearing was held before Judge Black to approve the retention of FBR. No one from FBR attended. (Trial Tr. vol. 2, 315:17–22.) At the hearing, the Debtors' counsel Neff said the following regarding changes to the draft retention order:

> I did want to point out a few changes we did make with regard to the requests of the United States Trustee, as well as with regard to Amalgamated's counsel, Your Honor, and that's now provided for in paragraph four of the draft order. There was a mention of a restructuring fee. And we now state in the order that that's specifically contingent upon the consummation of the[2] restructuring contemplated by the engagement letter. It had been implicit before[;] now it explicitly says that.

(Trial Tr. vol. 2, 315:23–316:22; Phillips Dep. 57:21–25, 58:11–25; Plan Transferee's Ex. 13.)

At trial before this Court, when Neff was asked what the "it" was that was implicit before and now made explicit, he answered: "Well, that FBR would only be entitled to a restructuring fee when the debtor confirmed the plan." (Trial Tr. vol. 2, 316:23–24, 317:1–2; 350:6–11.) Despite Neff's explanation, there was no evidence that he, or anyone else representing the Debtors, had ever advised FBR that the change to paragraph 4(a) of the Retention Order was intended to modify the definition of "restructuring" outlined in the Engagement Letter or modify the terms under which FBR would be entitled to the Restructuring Fee. (Trial Tr. vol. 1, 88:1–6.)

There was also no evidence that FBR ever heard the term "debtor-sponsored plan" during the course of the negotiations, in the preparation of the Retention Order, or in response to any of the concerns that were raised by the parties. (Trial Tr. vol. 1, 92:1–6.) FBR believed that the revised paragraph 4(a) of the Retention Order simply pointed back to the Engagement Letter and that a restructuring "as contemplated by the Engagement Letter" was the same as a restructuring "as defined in the Engagement Letter." (Trial Tr. vol. 1, 157:22–158:4.)

---

[2] The Retention Order in fact refers to "a" restructuring, not "the" restructuring.

9

Much is made by Bletchley about the fact that FBR used the term "success fee" when referring to the Restructuring Fee and that FBR used the two terms interchangeably. Trial testimony established that FBR used "success fee" as an informal term and used it loosely in a variety of contexts. In contrast, FBR representatives testified that they put significant effort into defining "restructuring fee" to "make it extremely crisp" and "comprehensive" because FBR did not want "any ambiguity whatsoever in that definition." (Trial Tr. vol. 1, 100:23–101:4; Phillips Dep. 28:14–20.)

In the declaration Neff submitted in connection with Bletchley's opposition to FBR's motion for summary judgment, Neff stated: "In fact, it was my understanding from FBR that it would not agree to tie its fee to the success of its efforts." (FBR's Ex. Z; Trial Tr. vol. 2, 331:10–17.) At trial, Neff was asked if he thought that FBR ultimately agreed to make the Restructuring Fee contingent on the results of its efforts. Contrary to what he previously had stated in his declaration, Neff answered: "Honestly, I [have] looked at that sentence now three times, and I don't know what that says. . . . I keep reading it and—because that does not make sense." (Trial Tr. vol. 2, 332:18–333:3.)

When the Court denied confirmation of the Debtors' plan that prohibited credit bidding, Goldberg sent the following email message to others at FBR:

> As an fyi, the court, to our disappointment, rejected the plan that was submitted by our client and is letting the lenders . . . credit bid, which basically means we aren't getting paid anytime soon. We will keep you posted.

(Goldberg Dep. 115:8–17; Plan Transferee's Ex. 27.) Goldberg was asked about this email. He stated that he believed FBR would have to wait some period of time before getting paid, but at no point did he think that FBR would not get paid at all. (Goldberg Dep. 115:13–22.)

Neff prepared and filed FBR's interim fee application for its monthly fees. (Trial Tr. vol. 2, 317:3–13.) He refused, however, to prepare the final fee application that included a request for the Restructuring Fee. (Trial Tr. vol. 2, 317:19–318:6.) Neff stated that he would not have sought FBR's retention if that retention allowed FBR to get the Restructuring Fee no matter who accomplished the restructuring. (Trial Tr. vol. 2, 318:8–13; 319:21.) He believed that seeking FBR's retention under those circumstances would have been a breach of his fiduciary duty because it would have created a significant disincentive to any other parties, such as Amalgamated Bank or the creditors' committee, to file a plan if they knew they had to pay FBR a fee just for the benefit of confirming a chapter 11 plan. (Trial Tr. vol. 2, 321:9–16.) Thus, Neff refused to support FBR's final fee request and left FBR to fend for itself.

## ARGUMENTS

Bletchley argues that the Retention Order and the Engagement Letter are ambiguous and that extrinsic evidence shows that the parties agreed to limit FBR's recovery of the Restructuring Fee. What was contemplated by the Engagement Letter, according to Bletchley, was not simply *any* restructuring, but rather a restructuring that was the result of FBR's efforts, i.e., a restructuring pursuant to confirmation of a debtor-sponsored plan. Bletchley argues that FBR knew, and Neff's comments made clear, that the Restructuring Fee was to be earned upon only a restructuring achieved by the Debtors. Thus, the Restructuring Fee was a success fee, Bletchley says, and FBR was unsuccessful.

FBR argues that the Engagement Letter is unambiguous and, therefore, the Court should not consider any extrinsic evidence. FBR asserts that it is entitled to the Restructuring Fee pursuant to the broad definition of "restructuring" set forth in the Engagement Letter. According to FBR, the addition of paragraph 4(a) to the Retention Order did not alter the definition of

11

restructuring set forth in the Engagement Letter. FBR argues that there was no agreement with respect to Bobo's request that the Restructuring Fee be contingent on the success of FBR's efforts or, as Neff suggests, contingent upon confirmation of a debtor-sponsored plan.

## DISCUSSION

Before turning to the interpretation of the relevant documents in this matter, a threshold issue is FBR's challenge to the Court's consideration of the testimony and evidence introduced at trial. FBR asserts that the testimony and evidence should not be considered because doing so would violate the parol evidence rule.

### A. The Motion *in limine*

FBR filed a motion *in limine* to exclude extrinsic and parol evidence. FBR's main argument to exclude the evidence is that the Engagement Letter and Retention Order are not ambiguous. Therefore, FBR argues, the Court should look no further than the "four corners" of the documents when construing their terms. In addition, FBR asserts that Bletchley should be precluded from introducing certain evidence because of its failure to produce all responsive documents during discovery.[3] The Court took the motion *in limine* under advisement prior to the bench trial and allowed the parties to present their cases on the record. For the reasons set forth below, the motion *in limine* will be denied, and the Court will consider the extrinsic and parol evidence.

When the parties to an agreement have reduced the agreement to a written document and have included an integration clause which states that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from

---

[3] Regarding the alleged discovery failures, the Court finds that FBR's preclusion arguments are without merit. FBR also raised a hearsay objection in its motion *in limine*. Earlier in the case, Bletchley had contested FBR's fee application, alleging that FBR was not disinterested. FBR's hearsay objection relates to evidence that Bletchley sought to introduce in support of its disinterestedness argument. The prior unchallenged finding that FBR is disinterested renders moot FBR's hearsay objection to Bletchley's evidence on that point.

12

considering parol or extrinsic evidence to vary or add to the terms of the written contract. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 878 (7th Cir. 2005). "'[A]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (quoting *W. Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 291 (Ill. 1962)).

In this case, the parties reduced their agreement to a written document, the Engagement Letter. In the Letter, they included the following integration clause:

> This Agreement constitutes the entire Agreement between the parties and supersedes and cancels any and all prior or contemporaneous arrangements, understandings and agreements, written or oral, between them relating to the subject matter hereof.

(Plan Transferee's Ex. 4.) Therefore, extrinsic evidence would ordinarily not be admissible to vary or contradict this fully integrated written document.

One of the exceptions to the parol evidence rule, however, allows courts to consider extrinsic and parol evidence to explain the terms of an ambiguous contract. *Gallagher v. Lenart*, 874 N.E.2d 43, 59 (Ill. 2007); *Matthews v. Chi. Transit Auth.*, 9 N.E.3d 1163, 1188 (Ill. App. Ct. 2014). Whether an ambiguity exists is a question of law. *See Sunstream Jet Express, Inc. v. Int'l Air Serv. Co.*, 734 F.2d 1258, 1270 (7th Cir. 1984). Generally, there are two kinds of ambiguity in the context of contracts. "Manifest" or "intrinsic" ambiguity arises when the express language of the contract itself is fairly susceptible to more than one reasonable reading. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir. 1998). In contrast, "'[l]atent' or 'extrinsic' ambiguity arises when the terms are clear taken by themselves, but the surrounding circumstances create inconsistent interpretations." *Id.* at 1036 (citing the famous contract in

*Raffles v. Wichelhaus*, (1864) 159 Eng. Rep. 375, which specified that cotton was to be shipped aboard a ship named Peerless, but did not say which Peerless).

There is no "manifest" or "intrinsic" ambiguity in this case because the terms of the Engagement Letter are not susceptible to more than one reasonable reading. The Engagement Letter clearly defines "restructuring" as "any restructuring, reorganization and/or recapitalization . . . that involves all or a significant portion of the Company's outstanding [obligations] that is achieved, without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations . . . ." (FBR's Ex. A; Plan Transferee's Ex. 4.)

While there is no "manifest" or "intrinsic" ambiguity here, the Court is confronted with the "latent" or "extrinsic" ambiguity created by the Retention Order. As explained in the District Court Decision:

> Through its reference to "a restructuring contemplated by the Engagement Letter," the Retention Order modifies the Engagement Letter and suggests that some restructurings would not be so contemplated. By indicating that some restructurings would be contemplated by the Engagement Letter and others would not, the Retention Order creates an ambiguity regarding which restructurings count.

*FBR Capital Mkts.*, 2013 WL 5408848, at *3. This Court must resolve the ambiguity.

In cases of ambiguity, the Seventh Circuit has held admissible objective evidence as to the circumstances which supposedly created the ambiguity. *Bourke*, 159 F.3d at 1037 (citing *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 622 (7th Cir.1989)). "Objective evidence is the sort that can be supplied by disinterested third parties . . . ." *Id.* (internal quotation omitted). In contrast, subjective evidence, including the unsupported recitations of the parties as to their own understandings, generally has been held to be inadmissible. *Id.*; *see Stone Container Corp. v. Hartford Steam Boiler Inspection and Ins. Co.*, 165 F.3d 1157, 1162 (7th Cir. 1999) ("A latent

14

ambiguity thus requires extrinsic evidence to establish, as well as to resolve, and only objective evidence may be used for these purposes."). Because there is a "latent" or "extrinsic" ambiguity created by the Retention Order, the Court will consider extrinsic and parol evidence to shed light on the parties' understanding. In particular, the Court will consider whether the Retention Order made payment of the Restructuring Fee contingent on the success of FBR's efforts or the confirmation of a debtor-sponsored plan. FBR's motion *in limine* is denied in its entirety.

### B. What Was the Parties' Understanding?

The Court will interpret the Engagement Letter and Retention Order according to basic principles of contract law.

#### 1. Rules of Interpretation

The basic rules of contract interpretation are well-settled. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). The primary objective is to give effect to the parties' intent. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). The best indication of the parties' intent is the language of the documents, and the words used should be given their plain and ordinary meaning. *Id.* "A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson*, 948 N.E.2d at 47 (citation omitted). "[M]eaning and effect must be given to every part, and no part should be rejected as surplusage unless absolutely necessary since it is presumed that each provision was inserted deliberately and for a purpose." *White v. White,* 378 N.E.2d 1255, 1258 (Ill. App. Ct. 1978). If the words in the contract are clear and unambiguous, they must be given their plain, ordinary, and popular meaning. *See Gallagher*, 874 N.E.2d at 58. If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Thompson*, 948 N.E.2d at 47.

According to the plain language of the Engagement Letter, FBR is entitled to the Restructuring Fee for *any* restructuring, including a restructuring pursuant to a third party's plan. However, the Retention Order states that the Restructuring Fee is "contingent upon the consummation of a restructuring *contemplated by the Engagement Letter.*" (Plan Transferee's Ex. 14 (emphasis added).) Because the Court cannot simply ignore this language as surplusage, and because the very existence of that language in the Retention Order makes the agreement among the parties ambiguous, the Court must turn to the extrinsic and parol evidence to resolve the ambiguity and interpret what was contemplated by the Engagement Letter.

The testimony and evidence presented at trial compound rather than resolve the ambiguity. FBR asserts that it never would have accepted the engagement if the Restructuring Fee were contingent on either confirmation of a debtor-sponsored plan or the results of FBR's efforts. FBR's officers testified consistently on this point. In parallel fashion, Bletchley maintains that the Debtors would not have retained FBR if the Restructuring Fee were payable for *any* restructuring, despite the clear definition of restructuring in the Engagement Letter. Neff believed that FBR was entitled to the Restructuring Fee only if the restructuring occurred through a debtor-sponsored plan. Although he stated this position in his declaration, that declaration was challenged at trial. Further, the limitations suggested by Neff were never articulated in any contemporaneous documents, including emails among the parties.[4] The conflicting views presented at trial amount to unsupported recitations of the parties as to their

---

[4] Neff and attorneys at Morrison & Foerster LLP submitted the Neff declaration on behalf of Bletchley in connection with FBR's motion for summary judgment. Judge Black cited this declaration as the "most important evidence supporting" Bletchley's case. *In re River Rd. Partners, LLC*, No. 09 B 30029, 2012 WL 6585506, at *2 (Bankr. N.D. Ill. Dec. 17, 2012). At trial, Neff distanced himself from some of the statements in the declaration. He said that he did not draft the declaration; attorneys at Morrison & Foerster did. (Trial Tr. vol. 2, 335:23–336:3.) Significantly, Neff equivocated when asked about the statement in paragraph ten of the declaration: "In fact, it was my understanding from FBR that it would not agree to tie its fee to the success of its efforts." He continued by saying, "Honestly, I [have] looked at that sentence now three times, and I don't know what that says. . . . I keep reading it and—because that does not make sense." (Trial Tr. vol. 2, 332:18–333:3.)

own understandings, which is precisely the kind of subjective evidence that the Seventh Circuit has generally held to be inadmissible. Admissible or not, however, the parties' statements provide little guidance to the Court because both sides were equally credible as to their understandings. Thus, the contradictory subjective testimony cancels itself out.

Ultimately, there is no credible evidence that FBR acquiesced to Bobo's concerns about the scope of the Restructuring Fee. As stated in the September 9 email, Bobo thought that the Restructuring Fee should be a contingent fee based on the results of FBR's efforts, like a success fee. In response to the September 9 email, Phillips wrote: "It is true that we are only paid in the event the restructuring is successful, and as we discussed FBR has traded off monthly fees for a better contingent fee recovery." (FBR's Ex. K.) This statement is not the proverbial smoking gun that Bletchley makes it out to be because the statement itself is ambiguous. The argument that "the restructuring," as used in Phillips's email, refers to the restructuring pursuant to a debtor-sponsored plan begs the question by implicitly reading the phrase "the restructuring" to mean "the restructuring based on FBR's efforts." In fact, the phrase "the restructuring" is not so limited in its possible meanings and can just as easily be read to mean, more generally, the restructuring of the Debtors' debts. The statement also leaves open to interpretation the meaning of "successful." It provides no guidance as to whether FBR ultimately agreed to make the Restructuring Fee expressly contingent on the results of its efforts.

Nor is there credible evidence that the Retention Order materially changed FBR's right to the Restructuring Fee. Neff offered no clear explanation as to why he drafted paragraph 4(a) of the Retention Order the way he did. He merely speculated that Bobo provided him with the language that was ultimately used. That language, however, does *not* correspond to the suggested changes in Bobo's September 9 email. That is, paragraph 4(a) states that the

17

Restructuring Fee is "expressly contingent upon the consummation of a restructuring contemplated by the Engagement Letter," while the September 9 email suggested that the Restructuring Fee should "be expressly described in the order as a contingent fee based on the results of [FBR's] efforts, like a success fee."[5] Based on the actual language of the Retention Order, it is not unreasonable for FBR to have concluded that the definition of restructuring set forth in the Engagement Letter survived unchanged and that FBR was entitled to recover the Restructuring Fee for *any* restructuring as stated in the Engagement Letter.

Finally, there is no credible evidence that FBR agreed to make the Restructuring Fee expressly contingent on the results of its efforts. The Court finds it implausible that FBR agreed to the Restructuring Fee on a contingent basis, and hinged that fee on certain remote conditions—namely, FBR's ability to successfully restructure hotel properties during the hospitality industry's worst economic downturn in decades. It is equally implausible that FBR would be willing to accept monthly fees that were well below market rate without ensuring a good possibility of a return in the form of the Restructuring Fee. The Court finds that the most reasonable interpretation is that FBR agreed to lower its monthly fee in exchange for a higher Restructuring Fee. FBR believed that it would get the Restructuring Fee for any restructuring of the Debtors under chapter 11 but would not get the Fee for other outcomes, such as chapter 7 liquidation, foreclosure, or an assignment for the benefit of creditors. Taylor precisely drafted the Engagement Letter to increase the likelihood that FBR would get the Restructuring Fee, defining the term "restructuring" broadly to ensure that the Restructuring Fee would be triggered under a wide range of circumstances.

The language in the Engagement Letter as drafted is unambiguous. The Retention Order refers back to the Engagement Letter and to the broad definition of restructuring that entitles

---

[5] Bobo was conspicuously absent from the trial, and, curiously, no one called him to testify.

FBR to the Restructuring Fee for *any* restructuring. The Court finds no clear evidence that the language of the Retention Order was meant to limit FBR to a Restructuring Fee based on confirmation of a debtor-sponsored plan or on a restructuring that was the result of FBR's efforts.

### 2. *Contra proferentem*

Moreover, the Court finds that the ambiguity created by the Retention Order must be construed against Bletchley and in favor of FBR under the doctrine of *contra proferentem*. *Contra proferentem* requires any ambiguities in a contract to be resolved against its drafter. This is a secondary rule of interpretation that should be invoked "only after 'ordinary interpretive guides have been exhausted.'" *Baker v. America's Mortg. Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995); *William Blair & Co. v. FI Liquidation Corp.*, 830 N.E.2d 760, 778 (Ill. App. Ct. 2005) (quoting *Bunge Corp. v. N. Trust Co.*, 623 N.E.2d 785, 791 (Ill. App. Ct. 1993)). As some courts have observed, the rule is not an interpretive one at all. "Instead of seeking to divine the intent of the parties, the rule merely assigns the risk of an unresolvable ambiguity to the party responsible for creating it." *Premier Title Co. v. Donahue*, 765 N.E.2d 513, 517 (Ill. App. Ct. 2002).

Here, the Debtors created the ambiguity in the Retention Order with the changes to paragraph 4(a). Bletchley, as Plan Transferee, steps into the Debtors' shoes. If Bobo and Neff wanted the Restructuring Fee to be expressly contingent on the results of FBR's efforts or on the confirmation of a debtor-sponsored plan, there are ways they could have drafted the Retention Order to accomplish that goal. For whatever reason, they did not.

Instead, paragraph 4(a) is anything but clear. The ambiguity created by the Retention Order must be resolved by construing it against the parties responsible for creating it, namely Bobo and Neff on behalf of the unsecured creditors' committee and the Debtors. Thus, FBR's

view prevails. Accordingly, FBR is entitled to the Restructuring Fee for any restructuring, including the restructuring that occurred here, pursuant to a third party's plan.

## CONCLUSION

For the foregoing reasons, FBR's motion *in limine* is denied and the Court finds, based on the evidence presented, that FBR is entitled to the Restructuring Fee. FBR's Motion for Leave to Amend Second Interim and Final Application of FBR Capital Markets & Co. is denied as moot. Separate orders will be entered consistent with this Memorandum Opinion.

Dated: October 30, 2014

_____
Janet S. Baer
United States Bankruptcy Judge