**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-30029 |
| RIVER ROAD HOTEL PARTNERS, LLC, | ) | (Jointly Administered) |
| et al., | ) | |
| | ) | Hon. Janet S. Baer |
| Debtors. | ) | |

**AMENDED SECOND INTERIM AND FINAL APPLICATION OF
FBR CAPITAL MARKETS & CO. FOR ALLOWANCE AND FINAL APPROVAL OF
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED AS FINANCIAL ADVISOR TO THE DEBTORS FOR
THE PERIOD AUGUST 17, 2009 THROUGH NOVEMBER 23, 2011**

As directed by this Court's Order Approving Restructuring Fee [Doc. No. 1211], FBR

Capital Markets & Co. ("FBR"), financial advisor to River Road Hotel Partners, LLC, River Road

Restaurant Pads, LLC, River Road Expansion Partners, LLC, River Road Hotel Mezz, LLC,

River Road Restaurant Mezz, LLC, and River Road Expansion Mezz, LLC (collectively, the

"Debtors"), respectfully submits this amended application (the "Amended Second Fee

Application") pursuant to §§ 328, 330, 331 and 504 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002 and 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), Rule 5082-1 of the Local Rules for the United States Bankruptcy Court For

the Northern District of Illinois (the "Local Rules"), seeking interim and final allowance and

authorization of payment of compensation in the amount of $2,568,145.89 for services rendered

as financial advisor to the Debtors for the period September 1, 2010 through November 23, 2011

(the "Second Interim Compensation Period"), and reimbursement of expenses in the amount of

$1,846,838.32 including reasonable attorneys' fees in the amount of $1,773,331.00, incurred in

connection with filing and pursuing FBR's request for compensation and expense reimbursement

relating to the Second Interim Compensation Period and in support thereof states as follows:

8765692-v4

## JURISDICTION

1.      This Court has jurisdiction to consider this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND AND FBR'S RETENTION

2.      On August 17, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Court" or the "Bankruptcy Court").

3.      On August 20, 2009, the Bankruptcy Court entered an order [Doc. No. 28] directing joint administration of the Debtors' cases under Case No. 09-30029.

4.      On September 3, 2009, the Debtors filed an application to approve the employment of FBR as financial advisor to the Debtors [Doc. No. 48].

5.      On September 17, 2009, the Bankruptcy Court entered an Order Authorizing the Debtors' Retention and Employment of FBR Capital Markets & Co. as Financial Advisor to the Debtors Nunc Pro Tunc to the Petition Date [Doc. No. 79] (the "Retention Order").[1]

6.      Pursuant to the Retention Order, the Bankruptcy Court approved the retention and employment of FBR upon the terms and conditions of an engagement letter dated August 13, 2009 between the Debtors and FBR (the "Engagement Letter"), as modified in certain respects by the Retention Order.  A copy of the Engagement Letter is attached hereto as Exhibit A.

7.      As set forth in the Engagement Letter, the Debtors retained FBR to (a) review and analyze the Debtors' business, operations and financial projections; (b) prepare long-term

---

[1]    On September 21, 2009, the Court also entered an order approving FBR's retention as financial advisor to related debtors RadLAX Gateway Hotel, LLC (Case No. 09-30047) and RadLAX Gateway Deck, LLC (Case No. 09-30048) (together, the "RadLAX Debtors").

2

financial projections; (c) review and analyze capital structure and financing alternatives, including, without limitation, debt capacity analyses and evaluation of exit financing; (d) identify potential investors and negotiate with potential investors on behalf of the Debtors; (e) assist with the preparation of a plan of reorganization; (f) advise the Debtors on tactics and strategies for negotiating with various stakeholders regarding a plan; (g) prepare a feasibility analysis in connection with a plan of reorganization; (h) prepare liquidation analyses; and (i) provide testimony on behalf of the Debtors in connection with any of the foregoing services.

8.      Pursuant the Engagement Letter, as approved by the Retention Order, it was agreed that in connection with FBR's retention as financial advisor to the Debtors, the pre-petition cash retainer paid by the Debtors to FBR in the amount of $50,000 (the "Retainer") became payable to FBR immediately upon entry of the Retention Order.  Additionally, it was agreed that FBR would be (a) paid a monthly fee in the amount of $10,000 (the "Monthly Fee"), payable each month from the date of retention through the earlier of the effectiveness of a chapter 11 plan or termination of the engagement, with the first five Monthly Fees to be funded by the Retainer; (b) paid a restructuring fee (the "Restructuring Fee") equal to 1.35% of the aggregate principal amount of the outstanding indebtedness, trade claims, leases, litigation-related claims, and obligations and other liabilities of the Debtors (as set forth more fully in the Engagement Letter, the "Existing Obligations") restructured, reorganized and/or recapitalized (as set forth more fully in the Engagement Letter, in each case a "Restructuring"); and (c) reimbursed for its out-of-pocket expenses, including attorneys' fees and expenses (collectively, the "Expenses").[2]

---

[2]    The substantive terms of the engagement letter and retention order governing FBR's engagement as financial advisor to the RadLAX Debtors (e.g., monthly fees of $10,000) are identical to the substantive terms of FBR's Engagement in the Debtors' cases.

9.     The Retention Order also provides, among other things, that (a) FBR's retention was effective as of the Petition Date; (b) Local Rule 5082-1(c) is modified such that only FBR's restructuring professionals were required to keep time records in one-hour increments, and FBR's non-restructuring professionals were not required to keep time records; (c) the fees payable to FBR are subject to review pursuant only to the standards set forth in § 328(a) of the Bankruptcy Code, and not subject to the standards of review set forth in § 330 of the Bankruptcy Code; and (d) the reimbursement of FBR's Expenses is subject to review pursuant to the standards set forth in § 330 of the Bankruptcy Code.

10.     On June 4, 2010, the Debtors filed a joint chapter 11 plan and a bid procedures motion [Doc. No. 309] (the "Bid Procedures Motion"), whereby the Debtors proposed, among other things, to sell the InterContinental Chicago O'Hare Hotel (the "Hotel") and a parcel of real estate adjacent to the Hotel (collectively, the "Hotel Property"), and to preclude the Debtors' secured lenders (collectively, the "Lenders"), Amalgamated Bank, as Trustee of Longview Ultra Construction Loan Investment Fund ("Amalgamated") and U.S. Bank National Association ("U.S. Bank"), from credit bidding at the auction for the Hotel Property pursuant to § 1129(b)(2)(A)(iii) of the Bankruptcy Code.

11.     On October 5, 2010, the Bankruptcy Court entered an order [Doc. No. 462] (the "Bid Procedures Order") denying the Bid Procedures Motion.  The Debtors appealed the Bid Procedures Order, which was ultimately affirmed.  While the Bid Procedures Order was on appeal, the Lenders filed a chapter 11 plan.

12.     On July 7, 2011, the Bankruptcy Court entered an order [Doc. No. 853] confirming the Lender's Fourth Amended Joint Chapter 11 Plan [Doc. No. 840], as amended by the First

Addendum to Lenders' Fourth Amended Joint Chapter 11 Plan [Doc. No. 851] (as amended, the "Plan"). The Plan became effective on November 23, 2011 (the "Effective Date").

13.    Pursuant to the Plan, a liquidating trust (the "Liquidating Trust") was established to make payments to holders of claims against the Debtors and their estates, including administrative claims. See Plan at § 6.4. The Lenders are responsible for funding the Liquidating Trust. See id. at § 6.5.

14.    Bletchley Hotel at O'Hare LLC ("Bletchley" or the "Plan Transferee"), a wholly owned subsidiary of Amalgamated, was created pursuant to the Plan. Pursuant to the Plan, among other things, the Debtors' assets, including the Hotel, were assigned to Bletchley, subject to the Lenders' liens.[3] See id. at §§ 6.1 & 6.12. Bletchley was also appointed as the representative of the Debtors' estates pursuant to § 1123(b)(3)(B) of the Bankruptcy Code and delegated the authority to object to claims. See id. at § 6.12.

## SERVICES PERFORMED BY FBR

15.    From the Petition Date through November 23, 2011 (the "Final Compensation Period"), at the request and/or direction of the Debtors, FBR performed the financial advisory services contemplated by the Engagement Letter and such services are fully compensable.

16.    FBR's team of professionals who provided services to the Debtors has included Steve Goldberg (Senior Managing Director & Real Estate Group Head), Jim O'Brien (Managing Director), Brian Taylor (Managing Director), Kevin Phillips (Managing Director), Nathan Pierce (Associate), Adam Lefkowitz (Vice President), Randy Lederman (Associate), Sarah Wilson (Associate), Scott Woods (Analyst), Terry McGuirk (Analyst) and Michael Nagy (Analyst). See

---

[3]    Pursuant to the Plan, the Hotel was transferred to Bletchley. In July of 2014, Bletchley sold the Hotel to Loews Hotels & Resorts for approximately $120 million.

Exhibit D, Declaration of Brian Taylor dated November 12, 2014 (the "Taylor Declaration"), at ¶ 7.

17.    During the Final Compensation Period, members of FBR's Restructuring Finance & Advisory Group spent approximately 200 hours working for the Debtors and the related RadLAX Debtors, which is exclusive of the hundreds of hours expended by the members of FBR's Real Estate Investment Banking Group, who spearheaded the Debtors' and the RadLAX Debtors' marketing efforts.  Id. at ¶ 8.

18.    In consultation with the Debtors, FBR's real estate professionals focused their efforts on attempting to raise capital and/or attract a purchaser, investor or joint venture partner for the Debtors to effectuate a plan of reorganization.  Though not subject to time-keeping requirements, the amount of time expended by FBR's real estate professionals exceeded the hours expended by FBR's restructuring professionals.  Id. at ¶ 9.

19.    FBR's professionals reviewed, analyzed and pursued restructuring alternatives for the Debtors and engaged in an extensive marketing process to find a purchaser, joint venture partner or other investor for the subject properties.  FBR created an investment memorandum tailored specifically to the Debtors and their assets and a management presentation, both of which were sent to potential partners and other individuals and entities that FBR believed might be interested in a transaction with the Debtors.  Id. at ¶ 10.

20.    To prepare the marketing materials, FBR's professionals (a) traveled to and toured the Hotel; (b) toured comparable properties in the O'Hare market and analyzed the financial performance of competing hotels; (c) interviewed the Debtors' principals and the Hotel's management team; (d) performed research on comparable transactions in and around the O'Hare

market; and (e) worked with the Debtors to create financial models to evaluate the financial implications involved with potential restructuring alternatives. Id. at ¶ 11.

21.    Starting in November 2009, FBR identified and contacted 81 potential purchasers that it believed had the demonstrated industry interest, expertise and financial wherewithal to consummate an auction sale transaction. This marketing effort spanned several months, involved numerous calls between FBR and potential purchasers, and resulted in approximately 45 conference calls or meetings with potential purchasers and the Debtors' principals and numerous in-person meetings and property tours with potential investors. Id. at ¶ 12. As the Court observed in its recent Memorandum Opinion supporting the Restructuring Fee, FBR's work took place under extreme conditions presented by a historic downturn in the financial and hospital markets. See Doc. No. 1214 at p 18.

22.    FBR's marketing process resulted in a stalking horse (the "Stalking Horse") bidding to acquire the Debtors' assets following further marketing and a public auction and pursuant to a chapter 11 plan. Thereafter, FBR's professionals worked with the Debtors, the Debtors' counsel and the Stalking Horse and its counsel to formulate and implement a chapter 11 plan and bid procedures for an auction sale of the Debtors' assets. FBR's efforts included: (a) assisting the Debtors with preparing and negotiating a term sheet with the Stalking Horse; (b) continuing to provide market reviews and analyses; (c) preparing materials for presentation to the Debtors' secured Lenders, Amalgamated and U.S. Bank; (d) generally providing restructuring advice to the Debtors and their counsel; and (e) providing deposition and trial testimony through former Managing Director at FBR, Mr. Jim O'Brien, on August 16 and August 24, 2010, respectively. Id. at ¶ 13.

23.     After Mr. O'Brien's aforementioned deposition and trial testimony, the FBR team worked with the Debtors to formulate possible alternative plans of reorganization that might be acceptable to the Debtors' creditors in the event that the original proposed plan of reorganization could not be confirmed.  Members of the FBR team participated in numerous conference calls with the Debtors and their counsel in an effort that led to the formulation of an outline for such an alternative plan.  FBR also participated in calls and meetings with the Debtors and a possible financing source regarding potential alternatives that could serve as the foundation for a consensual resolution to the Debtors' bankruptcy cases.  FBR, together with the Debtors, the Debtors' counsel and the possible financing source, participated in a meeting with representatives of one of the Lenders, Amalgamated, during which the representatives of the Debtors outlined a possible alternative plan of reorganization in an effort to find a consensus for moving forward on a plan that could garner the Lenders' support.  Subsequent to that meeting, in a continued effort to reach agreement with the Lenders, FBR also communicated with another Lender, U.S. Bank, regarding a possible alternative to the Debtors' plan originally proposed in June 2010.  The Lenders were not receptive to discussions about such an alternative plan at that time.  FBR continued thereafter to make itself available to the Debtors for financial analysis and/or other financial advisory services required by the Debtors during the Bankruptcy Case.  Id. at ¶ 14.

24.     FBR never received from the Debtors any notice of termination of FBR's Engagement under the Engagement Letter, and FBR never terminated the Engagement.  Id. at ¶ 15.

### THE FIRST FEE APPLICATION

25.     On January 21, 2011, the Debtors filed an application [Doc. No. 555] (the "First Fee Application") seeking interim allowance of compensation and expense reimbursement to

8

FBR for the period from August 17, 2009 through August 31, 2010 (the "First Interim Compensation Period").

26.     On February 10, 2011, the Bankruptcy Court entered an order [Doc. No. 588] (the "First Compensation Order") granting in part FBR's First Fee Application and allowing interim compensation to FBR for accrued Monthly Fees in the full amount requested of $70,000 and expenses in the reduced amount of $9,143.92.[4]

27.     The Debtors paid FBR the full amount of the fees and Expenses allowed by the First Compensation Order.

## THE ORIGINAL SECOND FEE APPLICATION

28.     Pursuant to the Plan, applications by professionals for compensation and reimbursement of expenses under sections 328 and 330(a) of the Bankruptcy Code on account of services rendered on or before the Effective Date were due no later than 60 days after the Effective Date.

29.     Within 60 days of the Effective Date, on January 18, 2012, FBR timely filed its Second Interim and Final Application of FBR Capital Markets & Co. for Allowance and Final Approval of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Financial Advisor to the Debtors for the Period August 17, 2009 Through November 23, 2011 [Doc. No. 955] (the "Second Fee Application").

30.     Pursuant to the Second Fee Application, FBR sought approval and entry of an order authorizing and allowing payment of (a) interim compensation of fees in the total amount of $2,546,965.73, comprised of (i) $150,000 in unpaid, accrued Monthly Fees for the 15 months during the Second Interim Compensation Period, and (ii) a Restructuring Fee in the approximated

---

[4]   Pursuant to the First Compensation Order, the Court denied allowance of meal expenses in the amount of $1,222.90.

9

amount of $2,396,965.73; and (b) reimbursement of Expenses incurred in the amount of $3,035.09 during the Second Interim Compensation Period. FBR accordingly sought final approval and authorization of payment of fees in the amount of $2,666,965.73 for services rendered and reimbursement of Expenses incurred in the amount of $12,179.01 for the Final Compensation Period. In the Second Fee Application, FBR also reserved is rights to amend or supplement the Second Fee Application to request allowance and payment of additional compensation and Expenses, including attorneys' fees and costs in pursuing the Second Fee Application.

31.    On February 15, 2012, the Plan Transferee filed voluminous objections to the Second Fee Application [Doc. No. 972] (the "Objections"). The Plan Transferee objected that FBR was not entitled to the compensation requested in the Second Fee Application on a variety of grounds, including allegations that (a) the Plan was not a Debtor-sponsored restructuring; (b) FBR did not provide financial advisory services to the Lenders in connection with the Plan; (c) FBR's work did not contribute to the Lenders' Plan, nor was the Plan based on FBR's work in any way; (d) the Retention Order was improvidently granted; and (e) FBR was not disinterested.

32.    FBR filed a response to the Objections on March 14, 2012 [Doc. 1006].[5]

## DISCOVERY

33.    Shortly after filing its Objections, on February 17, 2012, the Plan Transferee served FBR with 30 requests for production of documents and a notice of deposition. The Plan

---

[5]    After briefing on the Second Fee Application had concluded, by letter dated April 25, 2012, David Neff, as counsel to the RadLAX Debtors, sought to terminate FBR's engagement in the RadLAX Debtors' cases. Although FBR would have been entitled to accrued and unpaid monthly fees of $200,000 for the period from September of 2010 through April of 2012 (FBR had been awarded monthly fees through August of 2010), FBR has not sought to recover those fees.

Transferee also sought to depose three former FBR employees involved in the Engagement: Messrs. Steve Goldberg, Jim O'Brien, and Kevin Phillips.

34.     FBR cooperated fully with the Plan Transferee's discovery requests.  In response to the Plan Transferee's document requests, FBR served Plan Transferee with written responses and produced nearly 350,000 pages of documents related to the negotiation of, and FBR's performance under, the Engagement Letter.  As requested by the Plan Transferee, FBR produced a witness on behalf of FBR, Mr. Brian Taylor, and produced for depositions the three former FBR employees mentioned above.

35.     In light of the Plan Transferee's voluminous Objections, FBR was also forced to engage in discovery.  FBR served Plan Transferee with 32 requests for production of documents, 18 written interrogatories and a notice of deposition.  These discovery requests related primarily to documents and information about the circumstances surrounding FBR's retention, Lender's formulation of the Plan, and valuation of the Existing Obligations (upon which the Restructuring Fee is calculated).

36.     The Plan Transferee produced a total of 84 pages of documents in response to FBR's discovery requests.

37.     Because the Plan Transferee was created by Amalgamated pursuant to the Plan and did not exist at the time FBR entered into and performed under the Engagement Letter, FBR was forced to also seek discovery from the Debtors, the Debtors' manager, Debtor's counsel and the two Lenders.  FBR's discovery requests from those entities related primarily to documents and information concerning the circumstances surrounding FBR's retention, formulation of the Plan, and the Existing Obligations.

8765692-v4

38.    In response to FBR's discovery requests to the Debtors, the Debtors' manager, Debtors' counsel and the two Lenders, only Debtors' counsel produced any documents—a total of 58 pages.  The Plan Transferee's parent, Amalgamated,[6] refused to produce any documents.  Accordingly, on October 5, 2012, FBR was forced to file a motion to compel Amalgamated to produce documents [Doc. No. 1089].   The Court granted FBR's motion to compel on October 17, 2012 [Doc. No. 1098].

## SUMMARY JUDGMENT

39.    On October 12, 2012, FBR filed a motion [Doc. No. 1090] (the "Summary Judgment Motion") and supporting papers [Doc. Nos. 1091, 1092 & 1093] requesting summary judgment granting the Second Fee Application.  A hearing on the Summary Judgment Motion (the "Summary Judgment Hearing") was scheduled for December 3, 2012.

40.    On November 15, 2012, Plan Transferee filed its brief opposing FBR's Summary Judgment Motion [Doc. No. 1112] (the "Opposition").   In its Opposition, the Plan Transferee abandoned some of its initial objections (i.e., that the Restructuring Fee was improvidently granted) and reasserted its arguments that FBR was not entitled to the compensation requested in the Second Fee Application because (a) the Plan was not a Debtor-sponsored restructuring; (b) FBR did not provide financial advisory services to the Lenders in connection with the Plan; (c) FBR's work did not contribute to Lender's Plan, nor did Lenders rely upon FBR's work in any way to fashion the Plan; and (d) FBR was not disinterested.  Plan Transferee did not cross-move for summary judgment.

---

[6]    The Plan Transferee is owned and controlled by Amalgamated.   Indeed, both entities designated the same individual to serve as their 30(b)(6) representative herein.  Further, both have been represented by the same counsel in connection with the Debtors' bankruptcy cases.

8765692-v4

41.     On November 21, 2012, FBR filed a reply [Doc. No. 1118] in support of the Summary Judgment Motion.

42.     In connection with its Opposition, the Plan Transferee filed a declaration from Debtors' counsel, Mr. David Neff [Doc. No. 1114] (the "Neff Declaration").

43.     On November 26, 2012, FBR filed a motion *in limine* [Doc. No. 1121] seeking, among other things, to preclude the Neff Declaration from being admitted into evidence at the Summary Judgment Hearing.

44.     Also on November 26, 2012, as directed by the Bankruptcy Court, FBR filed a joint pre-trial statement [Doc. No. 1120].

45.     The Bankruptcy Court held the Summary Judgment Hearing on December 3, 2012 before the Honorable Chief Judge Bruce W. Black.

46.     Following the Summary Judgment Hearing, on December 17, 2012, the Bankruptcy Court entered a Memorandum Decision [Doc. No. 1133] and Judgment [Doc. No. 1134] (collectively, the "Summary Judgment Order"), pursuant to which the Bankruptcy Court (a) granted partial summary judgment in favor of FBR by approving, on a final basis all Monthly Fees ($220,000) and Expenses ($12,179.01) sought in the Second Fee Application for the Final Compensation Period; (b) directed the Liquidating Trustee (as defined in the Plan) to pay to FBR, in accordance with the Plan (i.e., within 14 business days), the Monthly Fees ($150,000) and Expenses ($3,035.09) requested in connection with the Second Interim Compensation Period; (c) denied FBR's Summary Judgment Motion with respect to the Restructuring Fee; (d) granted *sua sponte* summary judgment to the Plan Transferee on the issue of FBR's entitlement to the Restructuring Fee; and (e) reserved judgment regarding any request by FBR for attorney fees incurred in filing and pursuing its Second Fee Application. In its

13

Memorandum Decision, the Court cited the Neff Declaration as "[t]he most important evidence" supporting its conclusion that FBR was not entitled to recover the Restructuring Fee.

47.     In connection with the Summary Judgment Order, the Bankruptcy Court also entered a docket-entry order [Doc. No. 1136] denying FBR's motion *in limine* as moot.

48.     The Plan Transferee did not appeal from any aspect of the Summary Judgment Order, including the Bankruptcy Court's conclusion that the Plan Transferee had failed to establish that FBR was disinterested and that FBR was entitled to its Monthly Fees and Expenses.  Despite being ordered by the Bankruptcy Court to pay FBR the Monthly Fees and Expenses awarded by the Summary Judgment Order within 14 business days of December 17, 2012, the Plan Transferee has failed and refused to make those Court-ordered payments to FBR.[7]

## THE APPEAL

49.     On December 28, 2012, FBR timely filed a Notice of Appeal of the Summary Judgment Order [Doc. No. 1138] to the United States District Court for the Northern District of Illinois (the "District Court"), appealing the Summary Judgment Order insofar as it granted summary judgment to the Plan Transferee and denied FBR's motion *in limine* as moot.

50.     In connection with prosecuting the appeal of the Summary Judgment Order to the District Court (the "Summary Judgment Appeal"), FBR prepared and filed all of the necessary documents, including, among other things, its designation of contents for inclusion in the record

---

[7]     Although professionals retained under § 327 of the Bankruptcy Code, like FBR, are entitled to the federal judgment rate of interest on uncollected fees and expenses from the date of the allowance of the administrative claim by a bankruptcy court, FBR is not hereby seeking post-judgment interest on the Monthly Fees and expenses for which the Liquidating Trustee has unjustifiably refrained from paying since January of 2013.  See, e.g., Matter of Caribou P'ship III, 152 B.R. 733, 740 (Bankr. N.D. Ind. 1993) (holding bankruptcy professional is entitled to interest at the federal judgment rate on approved fees and expenses from approval to collection); In re Energy Co-op., Inc., 95 B.R. 961, 966 (Bankr. N.D. Ill. 1988) (granting enhancement of previously awarded fees to account for delay in payment by awarding interest on the unpaid fees calculated at the U.S. Treasury Bill rate).

and statement of issues on appeal [Doc. No. 1142], a motion seeking a briefing order in the Summary Judgment Appeal [App. Doc. No. 7],[8] FBR's principal merits brief [App. Doc. No. 14], and FBR's reply brief [App. Doc. No. 18] responding to the Plan Transferee's brief in opposition to FBR's appeal.

51.     After the Summary Judgment Appeal had been fully briefed, on September 24, 2013, the District Court (Leinenweber, J.) entered an order [App. Doc. No. 19] reversing the Bankruptcy Court's grant of summary judgment in favor of the Plan Transferee, affirming the Court's denial of summary judgment for FBR, and remanding the matter for further proceedings (the "District Court Order").

## THE REMANDED SECOND FEE APPLICATION PROCEEDING

52.     After this matter was remanded to the Bankruptcy Court, Judge Black suggested and FBR and the Plan Transferee agreed to have the matter mediated before the Honorable Judge Donald R. Cassling (the "Mediation").

53.     As directed by the Bankruptcy Court, FBR submitted a mediation letter to Judge Cassling on December 4, 2013 setting forth FBR's position with respect to its entitlement to the Restructuring Fee.

54.     On December 11, 2013, representatives of, and counsel for, FBR and the Plan Transferee attended the Mediation.  Although FBR participated in the Mediation in good faith, no settlement was possible because the Plan Transferee's representatives were unwilling to offer anything above a *de minimis* "nuisance value" to resolve FBR's claims.

---

[8]    References to the "App. Doc. No." refer to the docket of the Summary Judgment Appeal before the District Court, Case No. 1:13-cv-00746.

55.     Following the unsuccessful Mediation, the Bankruptcy Court scheduled a three-day bench trial (the "Trial") to hear evidence and decide whether FBR is entitled to the Restructuring Fee.

56.     In advance of Trial, on February 7, 2014, FBR filed a motion [Doc. No. 1185] seeking to amend the Second Fee Application to assert alternative, equitable theories of recovery under *quantum meruit*, restitution, reliance and promissory estoppel.  That motion was filed to preserve FBR's right to assert equitable bases for recovery of its fees if the Engagement Letter was ultimately found to be ambiguous or otherwise enforceable in a manner that rendered the Restructuring Fee unpayable.

57.     As directed by the Bankruptcy Court, in advance of Trial, FBR worked with the Plan Transferee in preparing a renewed pre-trial statement, which FBR filed on March 13, 2014 [Doc. No. 1197].

58.     Over three days, from March 24, 2014 through March 26, 2014, the Bankruptcy Court conducted Trial before the Honorable Janet S. Baer.

59.     Following the Trial, on April 23, 2014, FBR filed its post-trial brief [Doc. No. 1204] as directed by the Bankruptcy Court.

60.     On October 30, 2014, the Bankruptcy Court entered an Order Approving Restructuring Fee [Doc. No. 1211] and supporting Memorandum Opinion [Doc. No. 1214] (collectively, the "Restructuring Fee Order"), pursuant to which this Court (a) held that FBR is entitled to the Restructuring Fee under the Engagement Letter and Retention Order and (b) directed FBR to submit this amended fee application for the Second Interim Compensation Period with updated calculations.  As a result of the Restructuring Fee Order, the Bankruptcy

16

Court denied as moot FBR's motion for leave to amend the Second Fee Application to assert claims for equitable relief.[9]

## THE AMENDED SECOND FEE APPLICATION

61.    As directed in the Order Approving Restructuring Fee, and in accordance with the Retention Order and the Engagement Letter, FBR hereby seeks approval and entry of an order authorizing and allowing, on an interim and final basis, (a) payment of a Restructuring Fee in the total amount of $2,568,145.89 and (b) reimbursement of actual and necessary Expenses in the amount of $1,846,838.32, including reasonable attorneys' fees in the amount of $1,773,331.00,[10] incurred in connection with filing and pursuing the compensation initially requested in the Second Fee Application.[11]

62.    Attached hereto as Exhibit B is a detailed calculation of the Restructuring Fee.  A statement of FBR's out-of-pocket Expenses incurred in connection with filing and pursuing its request for payment of the Restructuring Fee is attached hereto as Exhibit C.  Attached hereto as Exhibit D is the Taylor Declaration, attesting to, among other things, the accuracy of the information set forth in Exhibits B and C of this Amended Second Fee Application.  Also, attached hereto as Exhibit E is the Declaration of Andrew J. Currie dated November 13, 2014 (the "Currie Declaration"), and attached hereto as Exhibit F is the Declaration of William J. Barrett dated

---

[9]    FBR continues to reserve all rights to seek approval and allowance of payment of FBR's fees as a matter of equity, including under theories of *quantum meruit*, restitution, reliance, and/or promissory estoppel, in the event it is later determined that the Restructuring Fee is not recoverable under terms of the parties' contract and the Retention Order.

[10]   This amount includes all reasonable attorneys' fees incurred up to but not including the date of this Amended Second Fee Application.  FBR reserves all rights to seek approval and allowance of additional attorneys' fees and other costs and expenses already incurred and hereafter incurred in connection with pursuing and defending this Amended Second Fee Application.

[11]   FBR reserves all rights to seek post-judgment interest in the event the Liquidating Trustee fails to timely pay FBR the fees and expenses awarded by the Court.

8765692-v4

November 13, 2014 (the "Barrett Declaration"), attesting to FBR's legal fees and costs incurred in connection with filing and pursuing FBR's request for payment of the Restructuring Fee.

## LEGAL BASIS FOR REQUESTED RELIEF

### *The Restructuring Fee*

63.    Pursuant to the Retention Order, the Bankruptcy Court pre-approved the compensation and retention terms contained in the Engagement Letter, subject to certain modifications not applicable to this Application.  Consequently, the fees payable to FBR are subject to review only pursuant to the standards set forth in § 328(a) of the Bankruptcy Code. See Retention Order at ¶ 4.

64.    As held in the Bankruptcy Court's Restructuring Fee Order, FBR is entitled to the Restructuring Fee requested hereby pursuant to the terms of the Engagement Letter. Specifically, the Plan was confirmed and has become effective, thereby effecting a "Restructuring" under the Engagement Letter, and triggering the Restructuring Fee payable to FBR equal to 1.35% of the Debtors' restructured Existing Obligations.  See Engagement Letter at § 3(c); Retention Order at ¶ 4.

65.    Attached hereto as Exhibit B is a detailed calculation of the Restructuring Fee, which, in accordance with the terms of the Engagement Letter, was calculated based on 1.35% of the aggregate principal amount of the Existed Obligations restructured through the Plan.[12]

---

[12]    As discussed above, FBR sought discovery from the Plan Transferee, the Debtors, the Debtors' manager and the Lenders regarding the amount to the Debtor's Existing Obligations.  However, no responsive information was provided.  Accordingly, FBR's Restructuring Fee calculation is based on the information available to FBR.  FBR reserves all rights to amend or supplement the calculation of the Restructuring Fee as FBR may deem necessary or appropriate, based upon new or different information regarding the amount of the Debtor's Existing Obligations.

66.     All timely objections to the award of FBR's Restructuring Fee have now been conclusively resolved by the aforementioned Summary Judgment Order, District Court Order and Restructuring Fee Order.   Accordingly, the Restructuring Fee sought herein should be allowed and approved by this Bankruptcy Court pursuant to § 328(a) of the Bankruptcy Code.

*FBR's Expenses*

67.     FBR's out-of-pocket Expenses, for which reimbursement is sought, relate entirely to FBR's reasonable efforts to pursue its claims and enforce the agreed-upon, court-approved compensation structure set forth in the Engagement Letter and include attorneys' fees and expenses, airline tickets, train tickets, hotel accommodations, local travel (*e.g.*, taxi cabs), postage fees, courier fees, photocopy charges, printing fees, and court costs.   Plan Transferee's voluminous Objections, exhaustive discovery and tenacious trial positions put FBR to unwarranted and greater lengths and expense to recover the Restructuring Fee.   Indeed, FBR would not have recovered the Restructuring Fee if it had not vigorously prosecuted its Engagement Letter rights and the Second Fee Application through bitter discovery, motion practice, an appeal of this Court's *sua sponte* summary judgment in favor of the Plan Transferee, and subsequent trial after remand.   FBR reasonably incurred these expenses over a nearly-three-year period of litigation with *no* prospect of reaching a negotiated solution with Plan Transferee and its sole parent, Amalgamated, despite FBR's repeated requests.

68.     Pursuant to its Engagement Letter, FBR is entitled to be reimbursed for all of its reasonable Expenses.   As FBR counsel has repeatedly asserted in open Court throughout the three-year course of this litigation, the Engagement Letter specifically provides that FBR recover the legal fees and other Expenses sought by this application:

> In addition to any fees that may be payable to FBRC and, regardless of whether
> any transaction occurs, the Company shall promptly reimburse to FBRC (a) ***all***

*reasonable out-of-pocket expenses* (including reasonable travel and lodging, data processing and communications charges, courier services and other appropriate expenditures) *and* (b) *reasonable fees and expenses of legal counsel*, if any, in each case incurred by FBRC in connection with the services provided hereunder.

Engagement Letter at § 3(e) (emphasis added).  The Engagement Letter also includes a broad indemnification provision, which provides in relevant part:

The Company agrees to indemnify and hold harmless FBRC and its affiliates … and their respective directors, officers, employees, agents and controlling persons (FBRC and each such person being an "Indemnified Party") from and against *all losses, claims, damages and liabilities* …, joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, which are *related to or result from the performance by FBRC of the services contemplated* by *or the engagement of FBRC* pursuant to, this Agreement and will promptly reimburse any Indemnified Party for *all reasonable expenses (including reasonable counsel fees and expenses)* as they are incurred in connection with the investigation of, preparation for or defense arising from any threatened or pending claim, whether or not such Indemnified Party is a party and *whether or not such claim, action or proceeding is initiated or brought by the Company*.

Engagement Letter, App'x I (emphasis added); see id. at § 12 ("The Company agrees to indemnify FBRC and its controlling persons, representatives and agents in accordance with the indemnification provisions set forth in Appendix I …..").  It cannot be denied that the Engagement Letter entitles FBR to full reimbursement for all of its reasonable expenses, including attorneys' fees, incurred in connection with the Engagement and in any action or proceeding related thereto.  Because the Expenses sought in this Amended Application are directly related to the Engagement and to FBR's vigorously contested efforts to recover the fees and expenses due FBR under the Engagement Letter,[13] FBR's contractual entitlement to the Expenses sought is unassailable and entirely just and reasonable under the circumstances detailed above.

---

[13]  The Engagement Letter requires FBR to file applications for allowance of fees and expenses relating to the Engagement.  See Engagement Letter at § 4.

69.     The Expenses for which reimbursement is sought herein should be allowed and approved by this Bankruptcy Court pursuant to § 330(a) of the Bankruptcy Code.

70.     In the original Second Fee Application, FBR did not seek any fees or costs in connection with preparing and filing the Second Fee Application, including attorneys' fees, instead only reserving its rights to seek such amounts in the future.  Since the filing of the Second Fee Application, however, FBR has been forced by Plan Transferee and its sole parent Amalgamated to incur the Expenses at issue as a direct result of the Plan Transferee's implacable opposition to honoring the terms of FBR's Engagement Letter.

71.     For nearly three years now, FBR has been forced to engage in extensive discovery and litigation to secure payment of its Restructuring Fee.  First, following the Plan Transferee's Objections to the Second Fee Application, and at the Plan Transferee's own request, FBR was forced to engage in extensive discovery, including by responding to 30 written document requests, reviewing and producing nearly 350,000 pages of documents, and preparing for and attending four depositions.   In contrast, FBR's discovery requests were met largely with boilerplate objections and refusals to produce documents.  FBR was forced to file a motion to compel Amalgamated to comply with its discovery obligations (which motion was granted).  Second, in addition to analyzing Plan Transferee's Objection, FBR was required to prepare and file multiple motions and other papers in pursuing its Second Fee Application before the Bankruptcy Court, including FBR's Summary Judgment Motion, its motion *in limine*, and a pre-trial memorandum.   Additionally, in the 11 months between the filing of the Second Fee Application and the hearing on the Summary Judgment Motion, FBR was required to attend several hearings before the Bankruptcy Court.  Third, following the Bankruptcy Court's *sua sponte* grant of summary judgment in favor of the Plan Transferee in December of 2012 (based in

large part on the Neff Declaration, which was later contradicted by Mr. Neff's sworn testimony at

Trial), FBR was forced to file and pursue the Summary Judgment Appeal.  In order to comply

with the applicable rules of procedure and to pursue the Summary Judgment Appeal, FBR was

forced to prepare and file several filings, including FBR's principal merits brief and reply brief, as

well as analyze the Plan Transferee's filings in opposition to the appeal.  <u>Fourth</u>, after successfully

obtaining a reversal of the Bankruptcy Court's *sua sponte* grant of summary judgment in favor of

the Plan Transferee, FBR was forced to keep on litigating its rights to the Restructuring Fee on

remand.  In an attempt to resolve the matter (and thereby reduce the administrative fees and

expenses payable by the Plan Transferee), FBR participated in a Mediation with the Plan

Transferee.  Plan Transferee attended the Mediation but was unwilling to offer any meaningful

amount to settle this dispute.  When the Mediation was not successful, FBR was forced to prepare

for and attend the three-day Trial and research, draft and submit post-Trial briefing.  Additionally,

in connection with the second round of litigating FBR's fees, FBR was required to attend several

hearings and prepare and file several papers, including its motion to amend the Second Fee

Application to address the Plan Transferee's waiver arguments.

72.     Given the three-year struggle and conduct of the Plan Transferee in opposing

FBR's request for compensation in the Second Fee Application, the Expenses sought hereby are

actual and necessary and should be allowed and approved for reimbursement pursuant to § 330(a)

of the Bankruptcy Code.  <u>See</u>, <u>e.g.</u>, <u>In re Wind N' Wave</u>, 509 F.3d 938, 945-46 (9th Cir. 2007)

(holding that expenses for successfully pursuing and defending fee applications should be

recoverable in bankruptcy as "necessary to prevent the dilution that would result if creditors'

attorneys were forced to absorb the time devoted to successfully litigating a fee award—an

outcome that would be contrary to Congressional intent against fee award dilution."); <u>In re</u>

22

Churchfield Mgmt. & Inv. Corp., 98 B.R. 838, 886-87 (Bankr. N.D. Ill. 1989) (allowing compensation for preparing and prosecuting applications for compensation); In re Chicago Lutheran Hosp. Ass'n, 89 B.R. 719, 736 (Bankr. N.D. Ill. 1988) (holding that professionals should be compensated for preparing and prosecuting applications for compensation); Matter of Hutter Constr. Co., Inc., 126 B.R. 1005, 1013 (Bankr. E.D. Wis. 1991) (holding that "attorneys are entitled to be compensated for the time spent in defending fee applications, if the attorneys are successful in the defense").  But see In re ASARCO, L.L.C., 751 F.3d 291, 299 (5th Cir. 2014) (a distinguishable case adopting the minority view that § 330(a) of the Bankruptcy Code does not authorize compensation for the costs counsel or professionals bear to defend their fee applications), cert. granted sub nom., Baker Botts, L.L.P. v. ASARCO, L.L.C., No. 14-103, 2014 WL 3795992 (U.S. Oct. 2, 2014).

## NOTICE

73.    Copies of this Application have been served upon (a) Perkins Coie LLP, Attorneys for the Debtors, 131 South Dearborn Street, Suite 1700, Chicago, Illinois 60603-5559, Attn: David M. Neff; (b) Edwards, Wildman, Palmer LLP, Attorneys for Amalgamated Bank, 225 West Wacker Drive, Suite 2800, Chicago, Illinois 60606-1229, Attn: John W. Costello and Morrison & Foerster LLP, 425 Market Street, San Francisco, California 94105-2482, Attn: Adam A. Lewis; (c) Katten Muchin Rosenman LLP, Attorneys for U.S. Bank, 525 West Monroe Street, Chicago, IL 60661, Attn: John P. Sieger and Andrew L. Wool; (d) Reed Smith LLP, Attorneys for the Liquidating Trustee, 10 South Wacker Drive, Chicago, Illinois 60606-7507, Attn: Stephen T. Bobo; (e) the United States Trustee; and (f) all parties that have appeared or requested notice pursuant to Bankruptcy Rule 2002.

**WHEREFORE**, FBR respectfully requests that the Bankruptcy Court enter an order (i) granting this application; (ii) allowing on an interim and final basis compensation in the amount of $2,568,145.89 for services rendered as financial advisor to the Debtors for the period from September 1, 2010 through November 23, 2011 and expenses incurred by FBR in the amount of $1,846,838.32 in connection with filing and pursuing FBR's request for compensation and expense reimbursement relating to the Second Interim Compensation Period; (iii) directing the Liquidating Trustee to pay to FBR all fees and Expenses approved by the Bankruptcy Court but not yet paid in accordance with the Plan; (iv) allowing said fees and Expenses as a cost and expense of administration of the Debtors' bankruptcy cases; and (vi) granting such other relief as is the Bankruptcy Court deems just and proper.

Dated:  November 13, 2014                          Respectfully Submitted,


                                                          */s/ William J. Barrett*
                                                   WILLIAM J. BARRETT
                                                   Barack Ferrazzano Kirschbaum &
                                                   Nagelberg LLP
                                                   200 West Madison Street, Suite 3900
                                                   Chicago, IL 60606-3465
                                                   Phone: (312) 629-5170
                                                   Facsimile: (312) 984-3150
                                                   E-mail: william.barrett@bfkn.com

                                                   -and-

                                                   Andrew J. Currie (admitted *pro hac vice*)
                                                   Thomas E. Gilbertsen
                                                   VENABLE LLP
                                                   575 7th Street, NW
                                                   Washington, DC 20004
                                                   (202) 344-4000

                                                   *Attorneys for FBR Capital Markets & Co.*